UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

v.

CHARLES RAYMOND LANGSTON III,
CRL MANAGEMENT, LLC, AND
GUARANTEE REINSURANCE, LTD.,

                Defendants.
_____/

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

## INTRODUCTION

1. This case involves insider trading by Defendant Charles Raymond Langston III in advance of a public announcement that significantly decreased the price of AutoChina International Ltd.'s stock. Langston received material, non-public information concerning a registered follow-on offering of AutoChina's stock (the "AutoChina Offering") and then used that information to sell short 29,000 shares of AutoChina's stock in advance of the company's public announcement on March 24, 2010 that it had completed the offering. Langston made more than $193,108 in trading profits based upon the material, nonpublic information.

2. This case also involves three violations by the Defendants Langston, CRL Management, LLC, and Guarantee Reinsurance, Ltd of Rule 105 of Regulation M ("Rule 105") of the Securities Exchange Act of 1934 ("Exchange Act") [17 C.F.R. § 242.105]. Rule 105 is designed to prevent manipulative short selling just prior to the pricing of follow-on and secondary offerings and to facilitate offering prices determined by independent market forces. Rule 105 prohibits any person who made a short sale during a defined restricted period prior to

1

the pricing of an offering, from purchasing shares in that offering. The Defendants violated Rule 105 in connection with three follow-on offerings between November 2008 and March 2009 (the "Relevant Period"). During the Relevant Period, the Defendants made short sales during the Rule 105 restricted periods applicable to the follow-offerings by Wells Fargo & Company ("Wells Fargo"), Mitsubishi UFJ Financial Group, Inc. ("Mitsubishi"), and Alcoa, Inc. ("Alcoa") and purchased shares in the offerings by Wells Fargo, Mitsubishi, and Alcoa. The Defendants' violations of Rule 105 resulted in unlawful gains of approximately $1,310,000.

3. By engaging in the conduct alleged in this Complaint, Langston violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) and Rule 10b-5 of the Exchange Act [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5]. In addition, all three Defendants violated Rule 105 of Regulation M of the Exchange Act [17 C.F.R. § 242.105]. The Commission seeks a declaration from the court that the Defendants violated these laws; a judgment permanently enjoining them from future violations; an order requiring disgorgement of losses avoided and gains from the unlawful trading, plus prejudgment interest thereon; and an order imposing civil penalties.

## JURISDICTION AND VENUE

4. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1].

5. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

6. Personal jurisdiction over the Defendants and venue are proper in this district under Section 27 of the Exchange Act [15 U.S.C. § 78aa], as a substantial part of the acts and transactions constituting the alleged violations occurred within the Southern District of Florida. At all relevant times, Defendant Langston resided and maintained an office in this district from where he placed the trades discussed in this Complaint. In addition, Defendants CRL Management and Guarantee Reinsurance were located in this district.

7. In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## DEFENDANTS

8. Langston is a resident of Miami Beach, Florida. He is a seasoned trader with more than 20 years of experience trading stocks, bonds, and options. He actively trades securities through numerous accounts owned by CRL Management and Guarantee Reinsurance at several broker-dealers.

9. CRL Management is a Florida limited liability company that Langston formed, owned and controls. It is located in Miami Beach, Florida.

10. Guarantee Reinsurance is a Delaware corporation that Langston formed, owned and controls. It is located in Miami Beach, Florida.

## RELEVANT PARTIES

11. AutoChina is a Cayman Islands corporation located in the People's Republic of China involved in the commercial vehicle and sales business. At the time of the AutoChina Offering, its stock was registered with the Commission and traded in the United States.

12. Rodman & Renshaw, LLC ("Rodman"), was a New York City-based registered broker-dealer, which focused on PIPE (private investment in public equity) and RD (registered direct offering) transactions. AutoChina hired Rodman to act as its lead placement agent for the AutoChina Offering. Rodman terminated its broker-dealer registration with FINRA in September 2012.

13. Chardan Capital Markets, LLC ("Chardan"), is a New York City-based registered broker-dealer and investment bank, which focuses on micro, small, and mid-cap companies. AutoChina hired Chardan to act as one of its co-placement agents for the AutoChina Offering.

## FACTS

### A. INSIDER TRADING IN AUTOCHINA'S STOCK

14. On or about March 3, 2010, AutoChina hired Chardan and Rodman as the placement agents for its offering. Placement agents help companies such as AutoChina find investors and raise capital. Shortly thereafter, Chardan and Rodman began contacting potential investors regarding a registered follow-on offering (or dilutive secondary offering) by AutoChina.

15. On or about March 4, 2010, Langston opened an account for CRL Management at Chardan. According to the new account documents, Langston was the only person with trading authority over the account.

16. No less than two and one-half weeks later, on Monday, March 22, 2010, Chardan's representative sent Langston's associate the following e-mail:

> Call me asap about the . . . [AutoChina] deal this week. I got you approved to hear about the deal. I'll need you and CRL [Management] to agree to keep information confidential until it is public.

17.     Later that same day, Chardan's representative sent Langston's associate a second e-mail concerning the AutoChina offering:

> JK,
> Here is the story. I need to have final indications tomorrow morning. We will announce the pricing of the security after the close tomorrow. At that time I will send you the securities purchase agreement (typically one page.). I need to have had executed them back to me by 7:30 AM Wednesday . . . .

18.     On Tuesday, March 23, 2010 at approximately 8:51 am, Chardan's representative e-mailed Langston's associate stating, "if you want to be involved in this deal done [sic] I need to bring you and Ray [Langston] over the wall this morning." The phrase "over the wall" meant that Langston and the associate would receive non-public information. Should they choose to receive the information, they would be prohibited from using the information to trade and from disclosing it to any third parties.

19.     Shortly after this e-mail, Chardan's representative explained they were required to keep information about the offering confidential and were prohibited from using the information to trade AutoChina's stock.

20.     At approximately 11:09 am, on March 23, 2010, Chardan's representative sent an email, which contained the terms of the confidentiality and nondisclosure agreement agreed to during the conversation with Chardan's representative:

> Confidentiality and Non-Disclosure Agreement.
>
> Pursuant to our telephone conversation and as an inducement to obtain confidential investment information, this will confirm that you have agreed to keep the information to be disclosed/discussed as confidential and have agreed to not disclose the content of the information to any party not bound by our agreement. Furthermore, you agree not to use the information presented in connection with any investment outside the nature and scope of the proposed investment opportunity. This agreement shall terminate at the earliest of the public release of the information

5

>disclosed/discussed, the report or the completion/termination of the proposed offering.

21. At approximately 11:09 am, on March 23, 2010, Chardan's representative sent Langston's associate another email enclosing AutoChina's securities purchase agreement, which was final except for pricing information. The securities purchase agreement contained detailed confidentiality provisions and prohibitions against trading in AutoChina's stock, including prohibitions against short sales of the company's stock. Further, the securities purchase agreement specified that AutoChina had agreed to sell $100,000,000 worth of its shares in the offering.

22. At approximately 11:10 am, on March 23, 2010, Chardan's representative sent Langston's associate a confidential investor presentation concerning AutoChina which discussed, among other things: i) an overview of the company's business; ii) growth projections; iii) information about the company's current target market; and iv) other financial information.

23. At approximately 1:59 pm, on March 23, 2010, Langston placed his first order to sell AutoChina's stock short. Langston placed the order in a securities account held in the name of Guarantee Reinsurance.

24. Twenty minutes later, at approximately 2:19 p.m., a representative from Rodman sent Langston's associate an email attaching the final transaction documents (securities purchase agreement and purchaser signature page) with final pricing. Rodman's representative also disclosed to Langston's associate that the per share purchase price for AutoChina's shares was $35 and that AutoChina expected to announce the transaction before the market opened on March 24, 2010.

25. On March 23, 2010, from approximately 2:41 pm and through the market closing at 4:00 pm, Langston and his broker exchanged numerous instant messages regarding Langston's

short sales of AutoChina's stock. Langston placed numerous orders in different amounts and prices up until one minute before the market closed. Seconds after the market closed, Langston's broker told him Guarantee Reinsurance had sold short a total of 29,000 shares of AutoChina's stock at an average price of $41.75 per share.

26. Approximately thirty six minutes later, another Langston associate sent Chardan an email enclosing the securities purchase agreement signed by Langston on behalf of CRL Management subscribing for 40,000 shares of AutoChina's stock at $35.00 per share.

27. The following day, at approximately 8:14 am, before the market opened, Langston instructed his broker to buy 20,000 shares of AutoChina's stock for Guarantee Reinsurance's account when the market opened. Langston ultimately bought a total of 29,000 shares of AutoChina's stock for Guarantee Reinsurance's account at an average price of $35.094. Guarantee Reinsurance purchased these shares in the same account used to sell AutoChina's stock short the previous day.

28. At approximately 8:20 am, on March 24, 2010, Chardan's representative emailed Langston's two associates, confirming that CRL Management had purchased 40,000 shares of AutoChina's stock in the offering. CRL Management purchased the offering shares at a material discount. CRL Management's purchase price of $35 per share represented a more than 17% discount to the closing price of $42.43 per share the day before the announcement of the offering.

29. Furthermore, the AutoChina Offering caused a more than 15% dilution of AutoChina's total shares outstanding. Moreover, after AutoChina announced the offering, the price of AutoChina's shares dropped by approximately 15%.

30.     Langston never notified AutoChina, or its placement agents Chardan or Rodman, about the short sales he had completed on March 23, 2010.  Moreover, the securities purchase agreement was not rescinded or voided.

31.     From the trading in AutoChina's stock, Langston made trading profits of $193,108 (based on the difference between the gain on the short sales of AutoChina's stock and the cost to close the position).

### B.     RULE 105 VIOLATIONS

32.     Rule 105 (Short Selling in Connection with a Public Offering) provides, in pertinent part:

> In connection with an offering of equity securities for cash pursuant to a registration statement … filed under the Securities Act of 1933 ("offered securities"), it shall be unlawful for any person to sell short … the security that is the subject of the offering and purchase the offered securities from an underwriter or broker or dealer participating in the offering if such short sale was effected during the period ("Rule 105 restricted period") that is the shorter of the period:
>
> (1) Beginning five business days before the pricing of the offered securities and ending with such pricing; or (2) Beginning with the initial filing of such registration statement … and ending with the pricing.

[17 C.F.R. § 242.105(a)(1) (effective October 9, 2007)].  Essentially, Rule 105 imposes a bright line, strict liability prohibition against buying stock in an offering where the person has affected any short sales of the security that is subject of the offering during the Rule's restricted period.

33.     A short sale is "any sale of any security which the seller does not own or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller." [17 C.F.R. § 242.200].  The profit or loss on a short sale is determined by the price of the security purchased to cover the short sale, i.e., the price of the security purchased to repay the

lender the borrowed shares originally sold short. Accordingly, a short sale is profitable when the price of the security decreases after the short sale and the security is purchased by the seller for less than it was sold short.

34.     Short selling can artificially depress a share's market price, which can lead to lower than anticipated offering prices for secondary and follow-on offerings. This can lead to reduced offering proceeds for the issuer. Thus, Rule 105 is intended to foster secondary and follow-on offering prices that are determined by independent market dynamics and not by potentially manipulative activity.

35.     During the Relevant Period, the Defendants engaged in three transactions prohibited by Rule 105 involving follow-on offerings by three issuers, all of which were underwritten on a firm commitment basis. Notably, Langston was the only authorized signatory on the accounts of CRL Management and Guarantee Reinsurance that purchased shares in the follow-on offerings of Wells Fargo, Mitsubishi, or Alcoa.

### 1.     **Violation in Connection with the Wells Fargo Trades**

36.     On November 6, 2008, Wells Fargo announced the pricing of a follow-on offering of 407.5 million shares of its common stock at $27 per share. The Rule 105 restricted period relating to this follow-on offering was October 31, 2008 through November 6, 2008 - the period beginning five business days prior to the pricing of Wells Fargo's offered securities and ending with the pricing of those offering shares. The Wells Fargo offering was offered on a firm commitment basis.

37.     Over four days during the Rule 105 restricted period, Langston (in accounts held in the names of CRL Management and Guarantee Reinsurance) sold short a total of 489,000 shares of Wells Fargo stock at the weighted average price of $29.38 per share for total proceeds

of $14,368,140. Langston, through CRL Management and Guarantee Reinsurance, purchased from three different underwriters a total of 258,000 shares of the announced Wells Fargo offering at a price of $27 per share on November 6, 2008.

38.     In connection with this offering, the Defendants jointly made gains of more than $600,000 based upon the gain on the short sale of Wells Fargo stock.

### 2.     Violation in Connection with the Mitsubishi Trades

39.     On December 8, 2008, in connection with a U.S. offering, Mitsubishi announced the issuance and pricing of 134 million new common shares and a follow-on offering of 40 million treasury shares at $4.49 per American Depositary Share. Because Mitsubishi announced the pricing before the opening of the market on Monday, December 8, 2008, the Rule 105 restricted period relating to this offering was Monday, December 1, 2008 through Friday, December 5, 2008 - the period beginning five business days before the pricing of Mitsubishi's offered securities and ending with the pricing of the offered shares. Although the pricing was announced on Monday, December 8, 2008, the restricted period ended on Friday, December 5, 2008, because pricing was determined on that date. The Mitsubishi offering was offered on a firm commitment basis.

40.     On December 2 and 3, 2008, during the Rule 105 restricted period, Langston (in an account held in the name of Guarantee Reinsurance) sold short a total of 200,000 shares for total proceeds of $1,021,250. Langston, through CRL Management, participated in the Mitsubishi offering by purchasing 500,000 shares at $4.49 per share from an underwriter or broker or dealer who participated in the Mitsubishi offering on December 8, 2008.

41. The trading in Mitsubishi represented an overage situation because the number of shares purchased in the offering (500,000) exceeded the number of shares sold short during the offering's restricted period (200,000).

42. In connection with this offering, the Defendants jointly made gains of more than $190,000 based upon the gain on the short sale of Mitsubishi stock and their gain on the overage shares.

### 3. Violation in Connection with the Alcoa Trades

43. After the close of the market on March 18, 2009, Alcoa announced the pricing of an offering of 150 million of its common shares at $5.25 per share. The Rule 105 restricted period relating to this offering was March 12, 2009 through March 18, 2009. The Alcoa offering was offered on a firm commitment basis.

44. On March 17 and 18, 2009, during the Rule 105 restricted period, Langston (in an account held in the name of Guarantee Reinsurance) sold short a total of 500,000 shares for total proceeds of $2,682,000. Langston, through CRL Management, participated in the Alcoa offering by purchasing from two underwriters one million shares of Alcoa stock at $5.25 per share on March 18, 2009.

45. The trading in Alcoa also represented an overage situation because the number of shares purchased in the offering (1,000,000) exceeded the number of shares sold short during the offering's restricted period (500,000).

46. In connection with this offering, the Defendants jointly made gains of more than $500,000 based upon the gain on the short sale of stock and their gain on the overage shares.

47. As a result of the conduct discussed in paragraphs 32 through 46, Rule 105, which makes it "unlawful for any person to sell short … the security that is the subject of the offering

and purchase the offered securities from an underwriter, or broker or dealer participating in the offering if such short sale was effected during the period . . . that is shorter of the period: (1) Beginning five business days before the pricing of the offered securities and ending with such pricing; or (2) Beginning with the initial filing of such registration statement ... and ending with the pricing" was repeatedly violated.

## FIRST CLAIM FOR RELIEF

## INSIDER TRADING IN THE OFFER OR SALE OF SECURITIES

**(Fraud in Violation of Section 17(a) of the Securities Act)**
**(Solely Against Defendant Langston)**

48. The Commission repeats and realleages paragraphs 1, 3 through 31, and 33 of this Complaint as if fully restated herein.

49. Langston knew or was extremely reckless in not knowing that he possessed material, nonpublic information about the AutoChina Offering. On the basis of this material, nonpublic information, which was obtained in breach of a duty of trust and confidence, Langston, directly or indirectly, sold short shares of AutoChina.

50. By virtue of the foregoing, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, Langston: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

51.     By reason of the conduct discussed above, Langston, directly or indirectly violated, and unless enjoined, is reasonably likely to continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### INSIDER TRADING IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

**(Fraud in Violation of Section 10(b) and Rule 10b-5 of the Exchange Act)**
**(Solely Against Defendant Langston)**

52.     The Commission repeats and realleges paragraphs 1, 3 through 31, and 33 of the Complaint as if fully restated herein.

53.     Langston knew or was extremely reckless in not knowing that he possessed material, nonpublic information about the AutoChina Offering. On the basis of this material, nonpublic information, which was obtained in breach of a duty of trust and confidence, Langston, directly or indirectly, sold short shares of AutoChina

54.     By virtue of the foregoing, Langston, directly or indirectly, by use of the means and instruments out of interstate commerce, and of the mails in connection with the purchase or sale of the securities, as described in this complaint, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

55.     By reason of the conduct discussed above, Langston, directly or indirectly violated and unless enjoined, is reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

## SHORT SELLING IN CONNECTION WITH A PUBLIC OFFERING

### (Violations of Rule 105 of Regulation M)
### (Against All Defendants)

56.     The Commission repeats and realleges paragraphs 2 through 10 and 32 through 47 of the Complaint as if fully restated herein.

57.     During the Relevant Period, in connection with three offerings of securities for cash pursuant to a registration statement filed under the Securities Act, Defendants, directly or indirectly, sold short the securities that were the subject of the offerings during the restricted period and purchased the offered securities from an underwriter, or broker or dealer participating in the offering.  Each of these public offerings was conducted on a firm commitment basis.  By virtue of this conduct, on three separate occasions, each of the Defendants violated Rule 105 of Regulation M of the Exchange Act.  [17 C.F.R. § 242.105].

58.     By reason of the conduct discussed above, each of the Defendants, directly or indirectly, violated, and unless enjoined, are reasonably likely to continue to violate, Rule 105 of Regulation M of the Exchange Act. [17 C.F.R. § 242.105].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine, and find that the Defendants committed the violations of the federal securities laws alleged herein.

## II.

### **Permanent Injunction**

Issue a permanent injunction, enjoining Langston, his officers, agents, servants, employees, attorneys, and all persons in active concert or participation, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) and Rule 10b-5 of the Exchange Act. [15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5]. In addition, the Court should issue a permanent injunction, enjoining each of the Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Rule 105 of Regulation M. [17 C.F.R. § 242.105].

## III.

### **Disgorgement**

Order Langston to disgorge all profits earned or losses avoided as a result of the actions alleged herein relating to violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act and to pay prejudgment interest thereon. In addition, the Court should order each Defendant, jointly and severally, to disgorge all profits earned or losses avoided as a result of the actions alleged herein relating to violations of Rule 105 of Regulation M of the Exchange Act and to pay prejudgment interest thereon.

## IV.

### **Penalties**

Issue an order directing Langston to pay a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21A of the Exchange Act. [15 U.S.C. § 78u-1]. In addition, the Court should issue an order directing the Defendants to pay civil money penalties pursuant to Section 21(d) of the Exchange Act. [15 U.S.C. § 78u(d)].

V.

**Further Relief**

Grant such other and further relief as may be necessary and appropriate.

VI.

**Retention of Jurisdiction**

Further, the Commission respectfully requests the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

December 3, 2013   By: s/: Christopher E. Martin
Christopher E. Martin, Esq.
Senior Trial Counsel
S.D. Fla. Bar No. A5500747
Direct Dial: (305) 982-6386
E-mail: martinc@sec.gov

Andre J. Zamorano, Esq.
Senior Counsel
Florida Bar Number 967361
Direct Dial: (305) 982-6324
E-mail: zamoranoa@sec.gov

Attorneys for Plaintiff
**U.S. Securities and Exchange Commission**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:   (305) 536-4154

16